ROBERT J. GIRARD II (SBN 216949)
rgirard@girardbengali.com
OMAR H. BENGALI (SBN 276055)
obengali@girardbengali.com
GIRARD BENGALI, APC
333 South Grand Ave., Suite 4040
Los Angeles, California 90071
Telephone: (323) 302-8300
Facsimile:  (323) 302-8310

PAUL  GROBMAN  (NY  SBN  2192649)
*(pro hac vice forthcoming)*
grobtown@aol.com
THE LAW OFFICES OF PAUL
GROBMAN
555 5th Avenue Floor 17
New York, NY 10017

Attorneys for Plaintiffs SHIRLEY PIATT,
DARRELL ASBERRY, MICHAEL F.
CORDES, on behalf of themselves and all
others similarly situated

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| SHIRLEY PIATT, DARRELL ASBERRY, MICHAEL F. CORDES, on behalf of themselves and all others similarly situated, | Case No. |
|---|---|
| | **CLASS ACTION COMPLAINT** |
| Plaintiff, | **[DEMAND FOR JURY TRIAL]** |
| vs. | |
| THE MONEY STORE, INC., TMS MORTGAGE, INC., and HOMEQ SERVICING CORP., WELLS FARGO BANK, N.A., | |
| Defendants. | |

Plaintiffs Shirley Piatt, Darrell Asberry, and Michael Cordes, individually and on behalf of all others similarly situated, by and through their attorneys The Law Offices of Paul Grobman and Girard Bengali, APC allege as follows:

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

GIRARD BENGALI, APC
333 SOUTH GRAND AVE., SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

## JURISDICTION AND VENUE

1.    The jurisdiction of the court is invoked pursuant to the Class Action Fairness Act ("CAFA").  Jurisdiction of this court for the pendent claims is authorized by 28 U.S.C.A. § 1367.

2.    Venue is proper in this District in that Defendants are authorized to do business in California or at all times relevant herein have regularly conducted business within this District, and the acts complained of herein occurred in this District.

## NATURE OF THE CASE

3.    Plaintiffs brings this class action against Defendants under California Business & Professional Code §17200, et seq., Cal. Civ. Code §2924c and §2924d, and for breach of contract, fraud and unjust enrichment on behalf of themselves and all other similarly situated persons who were injured by actions of the Defendants.

4.    As set forth below, Defendants have engaged in misconduct in connection with servicing and attempting to collect amounts purportedly owed on residential home equity loans, including, but not limited to, collecting late fees after a loan a loan has been accelerated, collecting attorney's fees which were secretly and improperly shared with a non-attorney in violation of California law, and collecting other fees and expenses which were prohibited by California law and/or industry guidelines.

5.    This action is an outgrowth of Mazzei v. Money Store, Inc., 01-cv-5694 (S.D.N.Y. 2001) (hereinafter "the Mazzei action"), a putative class action filed in the United States District Court for the Southern District of New York in 2001 alleging that the defendants herein engaged in misconduct, including improperly charging Joseph Mazzei and two putative class's for attorneys fees, late fees and other fees which were improper.   As detailed below, in 2012, the court certified two nationwide classes involving allegations that the Defendants improperly charged borrowers for (i) post-acceleration late fees (hereinafter "the Late Fee Class") and (ii) attorneys fees which were shared with non-attorney outsourcers (hereinafter "the Fee-Shifting

Class")

6.      In December 2014, the claims of those two nationwide classes went to trial, and on December 18, 2014, a jury found that the defendants had improperly charged late fees to the class, and awarded damages in the amount of $54.8 million. On the fee-shifting claim, the jury found that the defendants were not liable for improper fee-shifting.   Thereafter, both parties made post-verdict motions, and on May 29, 2015, the district court decertified the nationwide Late Fee Class, effectively overturning the jury verdict, finding that the Class had failed to prove that the issue of privity with Class members could be established through generalized proof, and that this issue predominated over the issues which were subject to generalized proof.

7.      The court also found that – since Mr. Mazzei's loan had been originated by the defendants – he was not an adequate class representative who could represent the interests of those borrowers who were charged late fees but whose loans were merely serviced by or assigned to the defendants.

8.      The court also denied the motion to grant a new trial to the Fee-Shifting Class.

9.      Both classes appealed the lower court's rulings, and on July 29, 2016, the Second Circuit affirmed the decertification of the Late Fee Class and the refusal to grant a new trial to the Fee-Shifting Class.  The Late Fee Class made a Petition for Certiorari to the Supreme Court, which was denied on March 20, 2017.

10.      In the wake of these rulings, Plaintiffs now seek to certify certain subclasses in this litigation, as more fully described below.

## THE PARTIES

1.      Plaintiff Shirley Piatt currently resides at 401 Dublin Avenue, #C47, Bradenton, Florida.  At all relevant times, Piatt, along with her husband Charles, who is now deceased, resided at 706 Hile Lane, Englewood, Ohio.

2.      Plaintiff Darrell Asberry is a natural person who at all relevant times resided at 19101 Archwood Street, Los Angeles, California.

GIRARD BENGALI, APC
333 SOUTH GRAND AVE., SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

GIRARD BENGALI, APC
333 SOUTH GRAND AVE., SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

3.     At all relevant times, Plaintiff Michael F. Cordes resided at 277 South Torn Ranch Road, Lake Elsinore, California.

4.     Defendant The Money Store, Inc. ("Money Store Inc.") is, upon information and belief, a New Jersey corporation which had its principal place of business at 707 West 3rd Street, Sacramento, California 95605.

5.     Defendant TMS Mortgage, Inc. ("TMS") is, upon information and belief, a New Jersey corporation and subsidiary of The Money Store, Inc. TMS was engaged in the business of originating, purchasing, selling and/or servicing consumer mortgage loans. Its principal place of business was also 707 West 3rd Street, Sacramento, California 95605.

6.     Defendant HomEq Servicing Corp. is, upon information and belief, a New Jersey Corporation formerly known as the Money Store and/or TMS Mortgage, Inc. which acts as a servicer for mortgage loans.

7.     HomEq Servicing Corporation was the successor by merger to TMS Mortgage, Inc., and was a wholly owned subsidiary of The Money Store Inc. In 2000, TMS Mortgage, Inc. merged with, and changed its name to HomEq Servicing Corporation. (Money Store, Inc., TMS and HomEq are referred to collectively hereinafter as "the HomEq Defendants" or "HomEq"). Its' principal place of business was located 4837 Watt Avenue, North Highlands, California 95660.

8.     HomEq is currently owned by Wells Fargo Bank, N.A., the ultimate successor by merger to HomEq.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

9.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a) and (b) on behalf of the following classes of persons:

a.     All borrowers of loans originated by or assigned to HomEq who, after March 1, 2000, paid late fees after acceleration of the loan where the loan was not subsequently reinstated by the borrower's payment of the entire delinquent amount outstanding; and/or (b) all borrowers of

loans owned and/or serviced by HomEq for property located in California, Ohio, Delaware, Montana, New Jersey and/or Michigan who, after March 1, 2000, paid post-acceleration late fees.

b. All borrowers of loans owned and/or serviced by HomEq for property located in California who, after March 1, 2000, paid fees in foreclosure, bankruptcy or eviction actions which (i) were shared with Fidelity National Foreclosure Solutions (Fidelity) or another non-attorney outsourcer; or (ii) were in excess of the fees which were allowed to be charged under HomEq's governing Master Service Agreement with Fidelity and/or the Network Agreements with law firms and/or other service providers.

10. Excluded from the Class are the Defendants, officers and directors of the Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

11. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown, Plaintiffs believe there are thousands of members of the Class geographically dispersed throughout California and the United States.

12. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal and state laws complained of herein.

13. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by members of the Class may be small, the expense and burden of individual litigation makes it virtually impossible for the Class members to seek redress on an individual basis for the wrongful conduct alleged. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual

GIRARD BENGALI, APC
333 SOUTH GRAND AVE., SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

members of the Class.  Among the questions of law and fact common to the Class are the following:

> (a)  whether California state statutes were violated by Defendants' acts as alleged herein;
>
> (b)  whether the Defendants forced borrowers to pay fees or charges which were in excess of those allowed in their underlying loan documents;
>
> (c)  whether defendants improperly charged fees or expenses which were not permitted by the underlying contracts.
>
> (d)  whether defendants improperly charged fees or expenses which were not permitted by California law;
>
> (e)  whether the members of the Class have sustained damages as a result of the actions of Defendants complained of herein.

## FACTS

### A.   THE MAZZEI LITIGATION

14.   In or about February 2001, Joseph Mazzei instituted the Mazzei action against the HomEq Defendants.

15.    The Mazzei action arose from the following facts and allegations.  Mr. Mazzei took out a mortgage loan with HomEq in 1994.

16.    In 1998, Mr. Mazzei fell behind on his mortgage payments and, in 2000, the company accelerated his loan and initiated a non-judicial foreclosure action in California.

17.   In or about October 2000, with a foreclosure sale looming, Mazzei decided to sell his home to pay off the outstanding amount on the loan, and requested a payoff quote.  Thereafter, Mazzei paid the amounts quoted, and was advised that his loan was Paid in Full.

18.   On or about January 16, 2001, Mazzei wrote Defendants a letter requesting an explanation for, among other things, the "Attorney Outsourcing Fees"

GIRARD BENGALI, APC
333 SOUTH GRAND AVE., SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

and "Unpaid Other Fees" which the Payoff Quote claimed were owed.

19.    In June 2001, defendants wrote to Mazzei describing the basis for charging the "Attorney Outsourcing Fees" and "Unpaid Other Fees."

20.    The lawsuit instituted by Mr. Mazzei in February 2001 was extraordinarily lengthy.  Joseph Sprizzo, the original federal judge assigned to the case, refused to permit any discovery on the state claims raised by Mazzei until 2006, and prohibited any class action discovery until May of 2008, seven years after the institution of the lawsuit.

21.    Thereafter, Judge Sprizzo passed away, and the matter was assigned to a new judge.

22.    In May 2009, after Defendants Rule 30(b)(6) witness John Dunnery testified that the Defendants purged their data systems annually of loans which had been paid off or liquidated, Mr. Mazzei filed a motion seeking to enjoin the defendants from destroying any of the records in their databases, including records relating to the division of legal fees between HomEq and outsourcers.  Mr. Mazzei's motion specifically described how the destruction of data would affect the ability to show the fee-split between Fidelity and law firms should a class be certified:

> One of the principal claims for which the plaintiffs seek class certification involves the allegedly illegal sharing of attorneys' fees between HomEq Outsourcers like Fidelity and their local network attorneys.  While HomEq has admitted *generally* that Fidelity and other Outsourcers retain a portion of the legal fee ultimately paid by borrowers, HomEq has failed to provide any documents showing the *actual* division of purported "legal fees" in the matters . . . which were referred to the Outsourcers.

(A-95)[1].

23.    In their opposition to the motion, the HomEq defendants represented:

---

[1] The reference "A-" are to the appendix cites in the appeal of the Mazzei case.

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

> The Money Store has assured defense counsel that it has, and has long had, a "litigation hold" directive in place as to these actions, and that The Money Store has not destroyed documents, or engaged in the conduct which plaintiffs' motion for an injunction and sanctions accuses them of.

24.    In response to the testimony from Mr. Dunnery about data purging, Defendants stated:

> Mr. Dunnery . . . was not in charge of record-retention, and has only limited knowledge of it.  After [Mr. Dunnery's deposition testimony], we again checked with HomEq and were advised again that all of the records are retained in either the IT Turbo system, the New Invoice system, or Oracle....

A-242.

25.    Based on Defendants' representations that all data had been preserved, Mr. Mazzei withdrew the motion.

26.    In 2012, Mr. Mazzei moved for class certification.  In December 2012, the district court granted certification of two nationwide classes of all borrowers who Defendants charged: (1) late fees after acceleration where the accelerated loan was paid off ("the Late Fee Class"); and (2) amounts paid to Fidelity from attorneys' fees charged to borrowers ("the Fee-Split Class") for the period from March 1, 2000 to the present.  (A-838, A-899).

27.    Following class certification, pursuant to the court's direction, the parties met to discuss identifying class members from Defendants' computer systems and databases (hereinafter "the Databases").  At that meeting, Defendants revealed for the first time that they had sold HomEq, and that they no longer had possession of their Databases or any of the loan data which was contained therein.  HomEq told counsel for Mr. Mazzei and the two Classes that the loan information was now in the possession of the accounting firm of Ernst & Young ("E&Y").

28.    On February 28, 2013, the court held a hearing regarding the Databases. At the hearing, the Defendants produced Mark Buechner, Assistant General Counsel

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

GIRARD BENGALI, APC
333 SOUTH GRAND AVE., SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

of Wells Fargo (the entity which now owned the Defendants) to describe how E&Y came to possess the loan information. According to Buechner, Defendants relinquished control of the Databases when defendants purportedly sold HomEq to Barclays Capital Real Estate, Inc. ("Barclays") in November 2006. In 2010, Beuchner said he learned "after the fact" that Barclays sold the business to Ocwen Loan Servicing, LLC (hereinafter "Ocwen"), which was closing HomEq's operations. As Beuchner stated, "[w]hen I learned of that transaction, I became very concerned … [about] preserv[ing] records so that we could retake possession." (Doc. 197 at 14)[2] Accordingly, Buechner hired E&Y to make a copy of the loan data (hereinafter "E&Y Database"). *Id.* at 14-15.

29. Defendants admitted that the E&Y Database did not contain the electronic invoices from law firms to Fidelity, or data showing the actual division of legal fees between law firms and Fidelity. That information—critical to the identification of members of the Fidelity Fee-Split class—was purportedly contained on another Database which Defendants failed to preserve.

30. Following Defendants' disclosure that their Databases had not been preserved, Counsel for Mr. Mazzei and the Classes made multiple efforts to determine whether the missing data could be obtained elsewhere. In late May 2013, HomEq admitted that the E&Y Database was incomplete, and argued that a data hard-drive recently produced to the parties by Ocwen ("the Ocwen Database") might provide a more complete picture of the loans owned and/or serviced by Defendants during the Class Period. (A-932.)

31. In June 2013, in response to a subpoena, the Ocwen Database was produced to the parties by Ocwen. The database contained approximately 661 gigabytes of information on about 1.3 million residential loans.

32. The Ocwen Database, as well, presented significant challenges. The

---

[2] The reference "Doc." is to the Docket in the Mazzei lawsuit.

database bore little resemblance to the fluid databases used by defendants – loan information existed in fragments in 4,508 different tables.   Neither defendants nor their successors were able to produce a set of descriptions to analyze the loan data.

33.     Moreover, Defendants advised Mazzei's counsel that it was unable to produce any person who had personal knowledge as to how its respective data systems operated, and that the only person available was Jared Crafton, the E&Y forensic specialist whose first exposure to the data was in 2010, four years after Defendants had purportedly sold the servicing operation to Barclays and after Barclays servicing operation was already closed.  At an October 2, 2014 deposition, Crafton said that no one at Ocwen was knowledgeable about the Ocwen Database at the time it was transferred to Defendants and the plaintiffs. (10/2/2014 Crafton Dep., p. 97)

34.     Defendants' failure to preserve the MSP rules prevented Mr. Crafton from making numerous determinations regarding the database, such as when the Defendants considered a loan "paid off" and when it considered a loan "paid in full." As Mr. Crafton testified at a June 2014 hearing before the court:

> Q.  And what is the difference between paid off and paid in full?
> A. The difference is, it allows for a certain balance, and outstanding debt to be written off by the lender.
> Q.  And what is that amount?
> A.  It varies.
> Q.  What do you mean it varies?  This company had rules, didn't they?
> A.  I would imagine.
> Q.  Do you have any of those rules?
> A.  I do not.
> Q.  So you are not aware of any of the rules?
> A.  No.
>
> *              *              *              *
>
> Q.  [A]t what point does the amount which is written off mean that a loan is no longer paid off, according to defendants' rules?

A.  We don't know the defendants' rules.

35.    Mr. Crafton also admitted that defendant's failure to preserve the rules relating to the various "codes" used in the MSP System to describe different types of accounting transactions – such as "Code #081: 'Paid in Full'" and "#082: 'Loan Liquidated'" – prevented him from determining when these different codes were used:

> CRAFTON:  I believe that there is a difference and a reason why the defendants would use one code versus another, and I believe that decision point drives what they felt was a paid off loan and what was not a paid off loan.
>
> Q.  Do you know – do you have any information as to when they use one as opposed to the other?
>
> CRAFTON:  Based on our empirical analysis, we do.
>
> Q.  . . . You have already indicated that there are loans . . . in which every dollar was not paid off which are in code 81, isn't that accurate?
>
> CRAFTON:  Yes.
>
> Q.  So at what point does code 81 become code 82?
>
> CRAFTON:  I don't have that information.

36.    Mr. Crafton also testified that he was never provided with a list of the loans that were either owned or serviced by the Defendants, nor was he given information necessary to determine what investor codes signified, such as whether they indicated the owner of the loan, or the servicer of the loan, or both.  (Transcript of 6/2/2014 hearing, pp. 81-84)

37.    At the conclusion of Mr. Crafton June 2, 2014 testimony, the Court made the following comment:

> There are disputes over the database.  It is clear, as Mr. Crafton said, you would have expected that at one time there were documents that would answer all of these questions. . . . .
>
> The defendants over time had the opportunity to keep the documents that would have precisely indicated what the records were and which loans were accelerated, which

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

would be reinstated, but we don't have those records, so far as the parties have told me.

*Id*. at 131.

38.    At his October 2, 2014 deposition, Mr. Crafton repeatedly testified that – because of the Defendants' failure to maintain or provide him with information as to how the MSP system operated – he could only offer "guesses" as to how defendants operated the MSP system.[3]

39.    The Defendants' failure to retain this information regarding the databases and codes despite assurances to the contrary resulted in Defendants presenting an Expert Report which repeatedly qualified its conclusions regarding what codes in the Ocwen Database meant and referred to.[4]

40.    Counsel for Mr. Mazzei and the Classes made multiple attempts to determine whether the data relating to whether purported "legal fees" were ultimately split with outsourcers was contained in another existing database. In addition to subpoenaing Barclays and Ocwen, Counsel for Mr. Mazzei and the Classes issued

---

[3]    *See* 10/2/14 Dep. at 255 ("I do not know specifically what their procedures were or the triggers when somebody entering the data in the system would choose an 081 or an 082. I do have some guesses, though."); at 272 (emphasis added) ("I believe they were left with some sort of outstanding debt or perhaps there was a deed-in-lieu transaction or perhaps the house did not sell in the foreclosure sale and it became real estate owned. But ***those are just guesses*** as to why an outstanding debt was liquidated."); *id*. at 279 (when asked whether defendants characterized a deed-in-lieu of foreclosure, Mr. Crafton says that he "believes" it was coded as an 082 by defendants even if foreclosure wasn't completed, although "*that's a guess*"); *id*. at 319 (Crafton characterizes his attempt to match up payee codes with law firms and trustees which had Network Agreements with Fidelity as involving "educated guesses", and admits that if the defendants had preserved a list matching the 34,000 payee codes with the Network Attorneys and Trustees, "you wouldn't *have to guess*"); *id*. at 322 (admits he was guessing how the payee codes worked in the MSP System, because he "do[es] not know their procedures around the data input into MSP application").

[4] See Sept. 2, 2014 Expert Report reissued on October 23, 2014 p. 9 (indicating that certain Payee Codes with Payee Descriptions "*may* relate to Fidelity"); p. 10 (indicating that certain Payee Codes without Payee Descriptions "*may* relate to Fidelity"); p. 10 ("I cannot with certainty say whether all these [coded] entities are properly includable in this analysis"); p. 10 ("I cannot with certainty confirm that the entities identified in the Ocwen Database represent the same entities identified in the list of Network Agreements")

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

subpoenas to Fidelity and each of its successors seeking the data concerning the sharing of legal fees, including from Lender Processing Services ("LPS"), Fidelity's ultimate successor.

41.     In September 2013, LPS advised Counsel for Mr. Mazzei and the Classes that they had information in an electronic format for "approximately 300,000 [HomEq] loans," including "billing records regarding services provided to the law firms by Fidelity."   A-941.   However, LPS stated that the information was inaccessible, and it did not know whether the information could be "converted to a readable format," and that the search could cost tens of millions of dollars, for which it would not bear the expense.  (A-941).

42.     Counsel for Mr. Mazzei and the Classes provided this information to Defendants, who responded that they would not pay to retrieve the data.   A-945. Defendants' attitude toward the missing data was typified by a remark Defendants' counsel made to the court at a June 2014 hearing:

> It was not our burden to go after Fidelity.  As it happens, we sought information from Fidelity, and they have chosen not to give it to us.  Your Honor has been party to and aware of the disputes between Mr. Goldberg down in Florida [counsel to LPS] and Mr. Grobman [Plaintiffs' counsel] in New York about the new invoice system and who is going to pay and who is going to get what and how difficult it is to translate.  We have been bystanders to that event.  If they get it, fine.  If they don't get it, fine.  I don't think that the case is going to turn on that.

(A-1016).

43.     With the parties at an impasse, Counsel for Mr. Mazzei and the Classes made a motion in October 2013 to compel Defendants to provide the fee-split data based on spoliation.  (A-934) In July 2014, Magistrate Judge Ronald Ellis granted Mr. Mazzei's spoliation motion.  The Order found that "defendants had both the legal right and practical ability to obtain the information relating to fees in the New Invoice System ...."  (A-1028)  In addition, the Magistrate Judge ruled that HomEq acted

culpably in failing to preserve the fee-splitting data:

> In the [2009] motion, Plaintiffs made clear that they were seeking to enjoin the destruction of fee-related records either in the possession of Defendants or Fidelity....

> In their response ... Defendants stated that they have "not destroyed documents," and that they have "long had, a litigation hold" directive in place as to these actions"....

> Now, Defendants have informed Plaintiffs that the data in the New Invoice System is lost ... Thus, Defendants have failed to preserve the data after being put on notice that Plaintiffs intended it to be preserved, and after having affirmed that the data was being preserved. (A-1033-34)

44.    The Magistrate Judge also rejected the Defendants' argument that sanctions were inappropriate because Defendants told the court in 2009 only that the data was being generally "preserved", not that it was being preserved by HomEq:

> The attempt to shift the responsibility and blame to Fidelity is unavailing.  The duty to preserve belongs to Defendants. They had the ability to preserve the information through Fidelity.  They failed in that duty.

(A-1035)   The Magistrate ordered Defendants to "bear the costs of determining whether the New Invoice Data currently in the possession of LPS is searchable."  A-1037.

45.    Defendants filed objections to the Magistrate's Order, but took no steps to determine whether the fee-sharing data could be retrieved from LPS.  With a court-ordered trial-ready date of October 10, 2014 looming, Counsel for Mr. Mazzei and the Classes filed a motion in September seeking a range of evidentiary trial sanctions for Defendants' spoliation, including: (i) an adverse inference instruction on spoliation; or (ii) precluding Defendants from presenting evidence on fee-splitting.. A-1228.

46.    In opposition, HomEq submitted five affidavits asserting new information about the preservation of the relevant Databases diametrically opposed

GIRARD BENGALI, APC
333 SOUTH GRAND AVE., SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

to what the Defendants stated in 2009.  A-1386-A-1564.  Thus, according to affidavits from HomEq executive John Dunnery and Chris Hymer (a former LPS executive), neither New Invoice nor any other HomEq Database ever contained records showing the amounts that attorneys paid Fidelity for "technology or administrative service fees" in HomEq matters.  A-1386; A-1388.  Instead, the affiants now said that payments made by law firms to Fidelity were "on a separate internal computer system" to which HomEq purportedly did not have access.  A-1386; A-1388.

47.    The Defendants submitted another affidavit from senior company counsel Mark Buechner (hereinafter "Buechner Affidavit"), in which he testified about when HomEq first learned about the destruction of its' Databases:

> In 2010, Barclay's attorneys, not having given me any prior notice, advised me that they had completed a transaction to sell HomEq to Ocwen Financial Services.   I was advised that Barclays' access to New Invoice data was severed at or prior to the Ocwen transaction and that Fidelity had taken steps to dismantle the New Invoice system to non-operational status . . .   I am informed that to utilize the data, either the original New Invoice system would have to be resurrected or new software would have to be designed to read the data.

A-1392.

48.    On November 24, 2014, the court affirmed the Magistrate Judge's spoliation findings.  The court found that the information which Defendants failed to preserve was relevant to the claims made by the fee-split class, and was "part of the evidentiary chain and will be subject to possible use at trial."  A-2538.  The court also found that HomEq acted "willfully" and with "gross negligence" in failing to preserve the fee-split data, relying on the prior representations made by Defendants in response to the 2009 Sanctions Motion:

> The defendants responded to that motion with a declaration [which represented] … that the defendants had a "litigation hold" in place and that no documents had been destroyed. . . .

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

***

> The plain import of this declaration was that the defendants were providing assurance that records were being retained in among other places the New Invoice system.  It would have been irresponsible having made this representation not to have assured that the records were being maintained or to provide notice that the defendants did not in fact have any ability to assure that the records would be maintained in their current state so that they could be accessed.

A-2537-38.

49.    Despite making these determinations, the court found that Mr. Mazzei and the Split Fee Class were not entitled to any evidentiary remedy at trial.  The court found that additional sanctions were not appropriate because–while HomEqs' conduct was "grossly negligent" and "willful"— Defendants did not intentionally destroy fee-split information.  A-2574 ("there is no evidence of the defendants' bad faith in the sense that the defendants were intentionally depriving the plaintiff of information for use in this litigation.").   Moreover, crediting the new affidavits submitted by Defendants, the Court found that– while the information from the spoliated Databases was relevant to the claims of the Fee-Split Class– the New Invoice System "would not have reflected the actual payments to Fidelity" by the law firms.  A-2549.  Instead, according to the court, that information "should have been recorded in other databases" which the court found Mr. Mazzei never sought.  A-2546.  The court found Mr. Mazzei's purported failure to specifically seek the fee-split information from databases other than the New Invoice System made additional sanctions inappropriate.  A-2546.  The court concluded that Mr. Mazzei and the Split Fee Class were not only entitled to no evidentiary sanctions at trial, but also that they could not make any reference to the court's own findings that Defendants had willfully failed to preserve evidence.  A-2603.

50.    On December 8, 2014, a two-week trial began on Mazzei's and the class claims against Defendants.   Before the trial, the court ruled that Mr. Mazzei, the Late

GIRARD BENGALI, APC
333 SOUTH GRAND AVE., SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

Fee and the Split Fee class had a maximum of 15 combined hours to both present their respective cases, as well as to cross-examine the witnesses presented by the Defendants. (App. Vol. IX, A2595, 2676)

51.     Despite these time constraints, Mr. Mazzei and the Late Fee and Split Fee Classes attempted to present evidence for each element of the Late-Fee and Split-Fee Classes' breach of contract claims.

52.     However, with regard to the Fee-Split Claim, the class was prevented from presenting several critical pieces of testimony to the jury.   First, because of the spoliation of the Databases, Mr. Mazzei and the Fee-Split Class were unable to introduce evidence showing the direct fee-split between Fidelity and its Network Attorneys for either Mr. Mazzei or Fee-Split Class Members.  Moreover, because the court ruled that Mr. Mazzei and the Fee-Split Class could not even refer to the court's spoliation findings or introduce evidence relating to the missing Databases, Mr. Mazzei and the Fee-Split Class had no way to explain the failure to present this critical evidence to the jury.

53.     Second, the Court did not allow the Split-Fee Class to present testimony from Professor Bruce Green that the division of attorneys fees between defendant's attorneys and its Outsourcers constituted an impermissible referral fee. (Vol. IX, A-2591)

54.     Defendants took full advantage of the court's refusal to allow the class to raise what even the court recognized was HomEq's willful spoliation of its databases, repeatedly emphasizing the absence of any direct proof of payments by lawyers to Fidelity. (A-2755:1-7;A-3066:21-A-3067:11;  A-4063:1-A-4064:7;  A-4155:6-A-4116:25; A-4117:15-A-4121:13; A-4124:5-4125:19). In their summation, Defense counsel again emphasized the lack of direct evidence of payments to Fidelity:

> What is the documentary evidence of fee splitting? Well, plaintiff will point to the network agreements in this case, but those do not contain proof of payment; they merely set

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

> forth the services that Fidelity will provide for the lawyers and the charges the lawyers will pay for those services.
>
> ****
>
> Plaintiff has not put before you any checks or wires from law firms to Fidelity. There is a failure of proof of this claim because there is a failure to prove monies going to Fidelity. And that's what fee splitting is based on.

A-4336:2-7; A-4336:12-15; A-4331:1-4; A-4330:14-17 (arguing that the absence of evidence of "actual payments being made by the lawyers to Fidelity" is "a critical point in this case").

## B.   THE JURY VERDICTS

55.     On December 18, 2014, following denial of the Defense's second motion for judgment or to decertify the classes, the court presented the late fee and split fee claims to the jury. A-4316:5-9.

56.     On December 19, 2014, the jury returned a verdict on the Late Fee Claim, finding that HomEq breached the Note by charging Mr. Mazzei and the Late Fee Class monthly late fees after their loans were accelerated. The jury found that Mr. Mazzei was damaged in the amount of $133.80 (equal to five post-acceleration late charges) and that the Late Fee Class was entitled to $54,786,201.00 amounting to a little more than half of the damages testified to by Mr. Mazzei and the Late Fee Classes' experts. A-5331.

57.     On the Fee-Split Claim, the jury found that neither Mr. Mazzei nor the Fee-Split Class had proven that the Defendants breached the loan documents by charging them for "legal fees" which were divided between Fidelity and its Network Law Firms. A-5331.

## C.   THE POST-TRIAL MOTIONS AND DECISIONS

58.     Thereafter, both sides made post-trial motions. The Defendants moved for decertification of the Late Fee Class or, in the alternative, for judgment

GIRARD BENGALI, APC
333 SOUTH GRAND AVE., SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

notwithstanding the jury verdict.  The contention for both motions was the same:  Mr. Mazzei and the Late Fee Class "failed to prove on a classwide basis" that (i) the Late Fee Class members had their loans accelerated or (ii) "the members of the class were in privity with the defendants."  A-5336.

59.     The Fee-Split Class moved for a new trial under Rule 59, arguing that the court's refusal to grant any trial remedies for Defendants' failure to preserve fee-splitting evidence—or to permit Mr. Mazzei and the Split Fee Class to present evidence of spoliation to the jury—was a substantial error, especially when coupled with the Defendants' repeated arguments that there was no evidence of payments to Fidelity.

60.     On May 4, 2015, the parties appeared for oral argument before the court on the post-trial motions in the Mazzei litigation.  At oral argument, counsel for the defendants represented to the court that information in the Ocwen Database would not allow any determination as to which loans were merely serviced as opposed to originated or assigned to the Defendants:

> THE COURT:  Is there evidence in the record with respect to the number of loans that were serviced, but not originated, by the defendants?
> MR. POLLACK: I do not believe that that question is susceptible of being answered from the Ocwen database. And I don't think that there is other evidence of that, your Honor. (A.5303)

61.     By Order dated May 29, 2015, the court granted the Defendants' motion for decertification of the Late Fee Class pursuant to Rule 23 of the Federal Rules, overturning the $54.7 million verdict awarded by the jury.  A-5365-77.  As an initial matter, the court rejected Defendants' argument that there was no class-wide proof showing that the members of the Late Fee Class had their loans accelerated, finding that there was evidence that loans were generally accelerated 90 days after a borrower's last payment.  A-5361-62.  The Court also found that the jury's determination of the damages suffered by the Late Fee Class was reasonable.  A-5364.

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

62.     However, though the court noted that "the defendants did not make arguments about the issue of privity to the jury during the trial," A-5365, it found that Mr. Mazzei had failed to present class-wide proof that members of the Late Fee Class were in privity with the Defendants.  As a result, the court found that certification of the Late Fee Class was no longer appropriate "without any evidence establishing that the HomEq Defendants . . . were assigned specific contractual obligations, or were otherwise in privity of contract with the absent class members."   A-5374. Decertification was deemed warranted because Mr. Mazzei offered no "evidence as to how individual questions as to the contractual status of the borrowers would not predominate."  A-5377.  Moreover, the court found that—since Mr. Mazzei's loan was both originated and serviced by the Defendants– Mazzei was now "an atypical class representative for those members of the class whose loans were merely serviced by the defendants."  A-5375-76.  Indeed, the court concluded that decertification "furthers the interests of absent class members" because they will not be saddled by Mr. Mazzei's' "fail[ure] to produce enough evidence to protect their interests at trial." A-5377-78.

63.     On the fee-split claim, the court ruled that it acted appropriately in precluding Mr. Mazzei and the fee split class from presenting evidence relating to spoliation, while allowing defendants to argue that the absence of direct evidence of payments by lawyers to Fidelity demonstrated that it did not occur.  A-5337-46, A-5349-52.  According to the court, while "the defendants willfully failed to preserve the New Invoice System," A-5342, New Invoice "did not contain records of bills submitted to law firms or payments made by the law firms for technology or administrative services fees."  A-5341.

64.     The court found that Mr. Mazzei made "no discernable efforts to seek evidence of fee splitting from any source other than the New Invoice System," A-5344, such as the "other databases mentioned by the defendants in the course of the 2009 sanctions motion."  A-5343-44.  As a result, the "failures in proof" were not a

result of the court's refusal to grant evidentiary remedies at trial for Defendants' spoliation, but rather Mr. Mazzei's "lack of diligence in pursuing evidence." A-5343.

65.     The court also found that its refusal to allow Mr. Mazzei and the Split Fee Class to introduce evidence about spoliation was proper.  The court found that Mazzei and the Split Fee Class could not have introduced the Buechner Affidavit because it was inadmissible hearsay.  A-5350-51.  Moreover, the court further held that testimony relating to Defendants' grossly negligent and willful failure to preserve evidence "would not have been proper in light of the Court's denial of the plaintiffs' motion for additional sanctions." A-5350.

D.     **THE APPEAL OF THE MAZZEI ACTION**

66.     In June 2015, the Late Fee Class and the Split Fee Class appealed the decisions below to the U.S. Court of Appeals for the Second Circuit.

67.     As the Late Fee Class advised the Second Circuit, the trial court itself recognized that the imposition of monthly late fees after a loan has been accelerated has uniformly been prohibited by each of the many courts which have considered the issue.  See *Mazzei v. The Money Store*, 288 F.R.D. 45, 67 (S.D.N.Y. 2012) (in granting class certification, the trial court  noted that "the defendants do not produce a single case or statute in which a state has upheld or allowed a late fee after acceleration where a contract does not expressly provide for such a fee").  In fact, at trial, the court offered to instruct the jury as to any case allowing post-acceleration late fees if HomEq could bring one to the court's attention, which Defendants could not.  (A-4308)

68.     As for the Split Fee Class, the Appellants advised the court that it was unaware of a single decision in any court in which a party was precluded from bringing the defendants destruction of evidence to the jury's attention where *the court itself* found that: (i)  Mr. Mazzei had demanded that the evidence be preserved; (ii) the defendants were found to have been in control of the evidence; (iii) the defendants represented that the evidence had been preserved; (iv) the evidence was not preserved;

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

(v) the defendants acted willfully and with gross negligence in failing to preserve the evidence; (vi) the evidence was relevant, and Mr. Mazzei and the Split Fee Class were prejudiced.

### E.   THE SECOND CIRCUIT DECISION

69.   On July 15, 2016, the Second Circuit affirmed the decertification of the Late Fee Class, and the refusal to grant a new trial to the Split Fee Class.

### A.  Affirming Decertification

70.   The Court determined that a lower court has the right to decertify a class after a jury verdict in the class's favor.  While the Second Circuit recognized the "tension" between permitting post-verdict decertification under Rule 23 and the rights accorded by the Seventh Amendment, (App.17), it found that "the right of absent class members to adjudication by jury is unimpaired" by post-verdict decertification because they could file another action in which they would have a right to a jury. (App.12)  As a result, according to the Second Circuit, "[t]he right of absent class members to a jury trial is protected, not impaired, by the Rule 23(c)(1)(C) decertification procedure."

71.   The Second Circuit determined that a court entertaining a decertification motion against a prevailing class should apply Rule 59 in assessing the evidence credited by the jury, because "decertification [] has the same effect as would a grant of a motion for a new trial pursuant to Federal Rule 59(a)." (App.13)  Thus, as on a motion for a new trial under Rule 59, the Second Circuit found that a judge entertaining a post-verdict decertification motion

> is permitted to weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner.

(App.16-17, n.9 (citations and internal quotations omitted))

72.   The Court found that decertification of a class after a jury verdict in its favor "is reviewed for abuse of discretion." (App.19)   Applying that standard, the

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

court found that the district court did not abuse its discretion in decertifying the prevailing class because its findings and conclusions on the Rule 23 motion were "within the range of permissible decisions." (App.27) The court synthesized the lower court's findings relevant to the appeal as follows:

> The decertification was based on Mazzei's failure to prove through class-wide evidence the existence of privity and those members whose loans were serviced but not owned by it . . . The jury found that privity was proven: the district court found to the contrary, and determined that typicality and predominance were therefore lacking.

(App.20-21).

73. The Second Circuit held that the standard for overturning a jury verdict under Rule 50 was not relevant to a motion to decertify a prevailing class under Rule 23:

> Since the Rule 59(a) standard applies in this context, we need not decide whether Levitin's generalized testimony was legally sufficient to support a jury finding that class members whose loans were not originated by (or expressly assigned to) [the defendants] were in privity. (App. 24).

74. Because of the purported failure of the class to prove privity, the Second Circuit found that the district court did not abuse its discretion in decertifying the class based on its finding that issues subject to individualized proof predominated over issues subject to only individualized proof:

> A class-wide resolution to the privity question was not possible because, without *class-wide* evidence that class members were in fact in privity with [defendants], the fact-finder would have to look at every class member's loan documents to determine who did and did not have a valid claim... It was within the range of permissible decisions for the court to determine that [common] questions did not predominate over the individual questions of whether each class member was in a contractual relationship with defendants.

(App.27) For the same reason, the Second Circuit found that the district court did not abuse its discretion in finding that Mazzei was an atypical class member who had a "misalignment of interests" with the class because his loan was originated by the

GIRARD BENGALI, APC
333 SOUTH GRAND AVE., SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

1  defendants.  (App.25)

## B.  Affirming Denial of Motion for New Trial Based On Failure to Allow Class To Raise Defendants Spoliation

75.    In a Summary Order dated July 15, 2016, the Second Circuit found that the trial court did not abuse its discretion in declining to allow the Split Fee Class to raise the issue of spoliation to the jury despite the court's finding that the Defendants had acted willfully and with gross negligence in failing to preserve their databases because: (i)the lower court found that the Defendants did not act "with the intent to deprive the" Split Fee Class of the use of the information contained in the databases; (ii) Mazzei had the information from the New Invoice System, and still could not prove his individual claim; and (iii) the Fee-Split Class "failed to to articulate … a hearsay exception or exclusion pursuant to which admission of the affidavit" of Mark Beuchner submitted by the Defendants discussing the circumstances surrounding the spoliation "would have been proper."

## F.  PETITION FOR CERTIORARI

76.    The Late Fee Class filed a motion for rehearing to the Second Circuit, which was denied on September 8, 2016.  The mandate from the Second Circuit was issued on September 15, 2016.

77.    On December 23, 2016, the Late Fee Class filed a Petition for writ of certiorari to the Supreme Court.  On March 20, 2017, the Supreme Court denied the Petition for Writ of Certiorari.

## G.  THE NEW POST-ACCELERATION LATE FEE SUBCLASSES

78.    After the Second Circuit affirmed decertification of the late fee class following the jury verdict, counsel began the task of determining whether a Late Fee or Split Fee subclass could be certified.   Certification of a more narrow Late Fee Class involved several expensive and time-consuming challenges, including: (i) rehiring a data expert to analyze the Ocwen Database to determine whether (a) loans which had been originated by and/or assigned to HomEq could be identified, or (b)

1   whether loans in which HomEq had been assigned the right to collect and retain late

2   fees could be identified ; and (ii) identifying and locating potential class members

3   who would be willing to serve as Class representatives.

4   79.   Counsel for the Late Fee Class again hired Professor Richard

5   Holowczak, asking him to undertake these tasks.

6   80.   After extensive analysis of the Ocwen Database and related documents,

7   Mr. Holowczak found that -- even in its compromised form, and contrary to the

8   representations made by counsel for the Defendants -- there are a variety of ways in

9   which borrowers whose loans were originated by or assigned to Defendants can be

10   identified through the use of a series of generalized search queries in the Database.

11   81.   For instance, Holowczak found that the Ocwen Database allows loans to

12   be segregated by date of origination.   Since Defendant's Rule 30(b)(6) witness

13   testified that Defendants did not begin to service loans for third parties until October

14   2002, (Dunnery Deposition, 3/17/03, p. 87), it can be reasonably assumed that all

15   loans in the database before that point were either originated by – or subsequently

16   assigned to – Defendants.   Identifying these loans and cross-referencing them against

17   the data-set of all loans which were charged post-acceleration late fees (a data set

18   which has *already* been credited by both the jury in the Mazzei action *and* the court

19   granting post-verdict decertification) will quickly and expeditiously result in the class

20   of people who were improperly charged late fees *and* were in privity with the

21   Defendants.

22   82.   Secondly, despite the failure of Defendants to produce a list of loans

23   originated by and/or assigned to them (or to produce an individual with personal

24   knowledge who could provide testimony as to which investor codes in the Ocwen

25   Database consisted of loans which had been originated by or assigned to Defendants),

26   Holowczak found that many of the investor codes in the Database clearly indicate

27   loans owned by Defendants.   See Investor Code 002 ("HomEq REO); 019 (HomEq

28   Put Backs); 20 (HomEq Rescinded Loans); 402, 418-423, 498-499, 591, 713-714.

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

Moreover, Defendant's documents also indicate that Investor Codes f15, 0001, 100-103, 105, 107, 109, 111, 122, 128, 130, 133-134, 147, 149, 161, 166, 176, 183, 185, 200-202. 204-05 and 210, 586 and 717 are also comprised of loans which were originated by and/or assigned to Defendants.  (BCRE#677)  Holowczak's analysis of the investor code data in the Ocwen Database also reveals hundreds of other Investor Codes which appear to relate to loans which were either originated by or assigned to the Defendants.

83.    In addition, although Defendants failed to provide any investor codes for these entities, documents indicate that the following Trusts or other entities contained loans which had either been originated or assigned to the Defendants: HomEq Trust 2001-A, HomEq Asset Backed Certificates, Series 2001-A; Money Store Asset Backed Certificates, Series 1998-B; Money Store Trust 1998-C HomEq Residential Trust 2001-I, HomEq Asset Backed Certificates, Series 2001-I; First Union Home Equity Loan Trust 1998-1; First Union Home Equity Loan Trust 1998-2; First Union Home Equity Loan Trust 1997-1; First Union Home Equity Loan Trust 1997-2;  and First Union Home Equity Loan Trust 1997-3.  Again, a simple search query can identify all these loans, which can then be cross-referenced against the data-set of all loans which were charged post-acceleration late fees.

84.    In addition, documents filed in a Mississippi state court also disclose the existence of additional Trusts which the Defendants failed to reveal in the New York litigation.  Defendants either originated the loans in those Trusts, or had those loans assigned to them.

85.    The Remittance Table and Payee Codes in the Ocwen Database can also be used  to track down and confirm loans which were either originated by or assigned to Defendants.  The Remittance Table contains numerous references to bank accounts in the name of Defendants, with Payee Codes showing the nature of the amount charged and its movement into the account.   Accounts in the name of the Defendants indicate that they were assigned all of the loans from which payments were made into

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

1   that account.

2   86.   Moreover, in the Remittance Table, the PAYEE_CODE (or

3   CORP_ADVANCE_PAYEE_CODE or simply PAYEE) matched up with this

4   "remittance" table in the Ocwen database.   Thus, the remittance table contains payee

5   codes showing payments attributed to Foreclosure Principal, Attorneys Fees and Late

6   Charges, among numerous other fees and expenses.   A transaction such as

7   "601 Misc. Corporate Disbursement" with a corporate advance payee code

8   of "90R12" and a dollar amount in the "REC_CORP_ADVANCE_ADJ" would

9   indicate funds flowing to/from this payee.

10   87.   The Remittance Table also identifies multiple bank accounts in

11   Defendants name with a description which refers to Late Charges, which provides

12   further confirmation that the right to collect the late charges which were remitted in

13   these accounts had been assigned to the Defendants.   These assigned Late Charges

14   can also be tracked using the Payee numbers with which each of these accounts were

15   identified.

16   88.    According to deposition testimony given by Mr. Crafton on October 2,

17   2014, contrary to Defendants repeated prior representations to the court entertaining

18   the Mazzei action (10/2/2014 Crafton Dep., pp. 198-99, 202-03), Ocwen filtered the

19   loans in the E&Y Database by investor code, and thus the E&Y Database contains

20   loans that were **owned** (*not* serviced) by the Defendants during the Class Period.

21   (10/2/2014 Crafton Dep., pp. 58, 60-62, 88-89, 92, 95)

22   89.   Finally, to the extent that the Defendants failure to preserve the MSP

23   Database did result in an inability to identify loans which were owned by the

24   Defendants during the class period, the Plaintiffs and the class would in any event be

25   entitled to relief under Rule 37(e)(1) and/or (2) of the Federal Rules of Civil

26   Procedure.

27

28

GIRARD BENGALI, APC
333 SOUTH GRAND AVE., SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

## H. <u>MICHAEL F. CORDES</u>

90. In or about August 16, 2004, Michael F. Cordes took out a loan from Argent Mortgage Co., LLC for a home located at 277 South Torn Ranch Road, Lake Elsinore, California.

91. Shortly thereafter, the loan was transferred to a securitized trust named "Park Place Securities, Inc., Asset-Backed Pass-Through Certificates, Series 2004-MHQ1." Wells Fargo Bank, NA was the Trustee of the Trust, and HomEq was the servicer of the loans in the Trust.

92. Under the Pooling and Servicing Agreement between the 2004-MHQ1 Trust and Homeq ("The 2004-MHQ1 PSA"), HomEq Was Given The Right To Charge And Retain "Late Charges" And "Reconveyance Fees" As "Additional Servicing Compensation." (Prospectus Supplement Dated October 8, 2004 To Asset-Backed Pass-Through Certificates, Series 2004-MHQ1, p. S-79)

93. Despite the fact that the transaction occurred months earlier, records for Cordes loan in the Ocwen Database identify the loan setup and initial deposit as taking place on November 8 and 9, 2004.

94. On or about December 17, 2004, HomEq and its clients had a breach letter sent to Cordes advising him that he was in default on his loan, and that the loan would be accelerated within thirty days if the delinquent amounts were not paid.

95. Nevertheless, Cordes was unable to make any of his monthly payments after that point, and the loan was accelerated.

96. Despite this, late charges of $220.42 for monthly missed installments were charged on February 16th, March 16th, April 18th, May 16th, June 16th, July 18th, August 16th, Sept. 16th, Oct. 17th and Nov. 16th.

97. Under the contract between Cordes and the lender, late fees were permitted to be charged only on overdue monthly installments, and were prohibited after the loan had been accelerated.

98.   In addition, under California law, late fees after acceleration were also not permitted to be charged under §2924c(c), §2924d and §2954.4 of the California Civil Code.

99.   Despite this, HomEq charged Cordes for post-acceleration late fees in violation of California statutes and common law.

100.   In addition, HomEq and its lender client also charged Cordes $650 for Broker Price Opinions on January 27, 2005 and on July 6, 2005.

101.   Broker Price Opinions are not permitted to be charged under §2924c(c) or §2924d of the California Civil Code.

102.   In addition, HomEq and its lender client also charged Cordes $16 for Property Inspections on September 26 and Nov. 4, 2005.  Property inspections are not permitted to be charged after a Notice of Default is recorded under §2924c(c) or §2924d of the California Civil Code.

103.   On or about August 31, 2005, HomEq commenced foreclosure on behalf of its clients by filing a Notice of Default in the Riverside County Clerk's Office on Cordes property, saying that the amount of $39,646.18 was delinquent.

104.   On or about October 21, 2005, an assignment of mortgage was filed in the Riverside County Clerk's Office for Cordes property, transferring the Deed of Trust and Note from Argent Mortgage Co. to Ameriquest Mortgage Co.

105.   On or about October 21, 2005, an assignment of mortgage was filed in the Riverside County Clerk's Office for Cordes property, transferring the Deed of Trust and Note from Ameriquest Mortgage Co. to Wells Fargo Bank, N.A., as Trustee.

106.   On or about December 5, 2005, a Substitution of Trustee was filed in the Riverside County Clerk's Office for Cordes property, substituting Executive Trustee Services for Wells Fargo as the Trustee on the Deed of Trust.

107.   On or about December 5, 2005, a Notice of Trustee's Sale was filed in the Riverside County Clerk's Office for Cordes property.

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

108.   On or about December 9, 2005, Cordes sold his home to pay off the amounts purportedly owed and avoid the foreclosure sale of his home.  Cordes paid $490, 979.23 to HomEq to pay off the loan.

109.   According to HomEq's accounting database, HomEq took $2,210.64 of that amount on December 9, 2005 to pay itself for the late fees charged to Cordes, including late fees charged after his loan was accelerated.

110.   HomEq also collected $650 for the Broker Price Opinions described above, and $16 for the Property Inspections.

111.   HomEq also collected $1696.97 from Cordes for the purported repayment of foreclosure fees and/or expenses.

112.   HomEq also charged Cordes $60 for a Payoff Quote demand fee, $45 for a lien release fee and $9 for a Recording Fee on December 9, 2005.  None of these amounts were permitted to be charged after the Notice of Default was recorded under §2924c(c) or §2924d of the California Civil Code.

113.   According to HomEq's accounting database, Cordes loan was Paid In Full as of December 9, 2005.

114.   On or about December 27, 2005, a Substitution of Trustee was filed in the Riverside County Clerk's Office for Cordes property, substituting Princeton Escrow Co. for Wells Fargo.

115.   On or about December 28, 2005, the Notice of Default for Cordes property was rescinded.

116.   Notwithstanding that Cordes had paid off all amounts owed in full, HomEq's accounting history shows that on February 3, 2006 HomEq purportedly disbursed $540 in attorney's fees for foreclosure and $1435.13 in purported foreclosure court costs.

117.   Upon information and belief, the amount of legal fees and expenses charged to Cordes were in excess of the amounts which HomEq could be charged: (i) under its Master Service Agreement with Fidelity or another outsourcer; and/or (ii)

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

under the Network Agreements between Fidelity and/or another outsourcer, on the one hand, and the law firm or other entity performing the foreclosure.

## I.  SHIRLEY PIATT

118.  On or about January 6, 1999, Shirley and Charles Piatt (hereinafter "Piatt") took out a loan for $82,000.00 with Multi-Fund, Inc. secured by their home located at 706 Hile Lane, Englewood, Ohio.

119.  At some point thereafter, HomEq was assigned Piatt's loan, and became the owner of the mortgage note.

120.  In or around 2002, Piatt fell behind on the loan.  On or about May 12, 2003, HomEq served a breach letter on Piatt advising her that she was in default on the loan, and that the loan would be accelerated within 30 days unless she paid all delinquent amounts, including costs and attorney's fees.   Pursuant to the letter, HomEq thereafter accelerated the loan.

121.  On or about August 18, 2003, HomEq filed a foreclosure action in the Court of Common Pleas for Montgomery County, Ohio, stating that Piatt was in default of the loan as of April 10, 2003.

122.  Despite the acceleration of the loan, HomEq assessed post-acceleration late fees including, but not limited to, fees on June 20th, July 21st and August 20, 2003.

123.  On or about October 24, 2003, Piatt paid the loan in full, including the post-acceleration late fees.

## J.  THE NEW CLASS REGARDING IMPROPER FEES DARRELL ASBERRY

124.  In or about the early 2000s, Asberry took out a loan with Fremont Investment and Loan secured by his home which was subsequently assigned to and/or serviced by the Defendants.

125.  On or around April 14, 2004, Asberry had purportedly fallen behind on his loan, and Defendants and/or their agents filed a Notice of Default on Asberry's

property in the Los Angeles County Clerk's Office.  On the same day, Defendants and/or their agents filed a Notice of Substitution of Trustee.

126.   On or around July 13, 2004, Defendants and/or their agents filed a second Notice of Default in the L.A. County Clerk's Office.

127.   On or about August 3, 2004, Defendants and/or their agents filed a Cancellation of the Notice of Default on Asberry's property in the L.A. County Clerk's Office.

128.   On or about March 9, 2006, Defendants and/or their agents filed another Notice of Default on Asberry's property in the L.A. County Clerk's Office.

129.   On or about April 24, 2006, Defendants and/or their agents filed an Assignment of the Trust Deed from Fremont to U.S. Bank National other Notice of Default on Asberry's property in the L.A. County Clerk's Office.   Filing an Assignment of a Trust Deed after a Notice of Default is improper, and a foreclosure commenced in that manner is void.

130.   Thereafter, with foreclosure looming, Asberry paid the amount which the defendants represented was purportedly owing, including fees and expenses associated with the foreclosure.

131.   On June 9, 2006, Asberry paid off the loan in full by presenting Defendants with a check for $335,028.00.   In addition to using that payment for the principal, interest and escrow which was purportedly owed, the Defendants also charged Asberry for attorney's fees and expenses purportedly owed. Thus, on June 9, 2006, Asberry was charged $3,142.06 based on a charge with the Reason Code "OSFC" and the Reason Description "Esttrailin."   Upon information and belief, Asberry believes this relates to legal fees and/or expenses based on an invoice which were never disclosed to Asberry, nor provided to the Defendants, until after Asberry was told he had paid his loan in full.

132.   Because the Defendants failed to preserve their MSP Accounting Database after representing to the <u>Mazzei</u> court that they had done so, it is difficult to

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

determine exactly what this amount relates to.  However, upon information and belief, the $3,142.06 includes (i) fees which were improperly shared with a non-attorney in violation of California law and/or in clear violation of governing Fannie Mae and Freddie Mac regulations, which provide the industry standard, See 36.4814,Advances and Other Charges, 73 FR 6293, 6296 (2008) (VA adopts rule prohibiting the assessment of outsourcing fees "consistent with the position taken by Freddie Mac, which prohibits payment for referral fees, packaging or other similar fees and new case startup fees in its Single Family Seller/Servicing Guide"); and/or (ii) fees which were in excess of those which the Defendants themselves were allowed to be charged under their Master Service Agreement with Fidelity or other outsourcer; and/or  (iii) fees in excess of those which Defendants themselves were allowed to be charged under the Network Agreements between Defendants and the entities representing them in foreclosure.

133.   Moreover, the Ocwen Database also indicates that the Defendants also charged Asberry $325.00 for a Broker Price Opinion, over $200.00 more than what was allowed to be charged under Fannie Mae regulations.

134.   Moreover, the partial records obtained from the Ocwen Database indicate that Defendants had not posted any payments to principal in Mr. Asberry's account since September 1, 2005.  As the Mazzei court found in its May 29, 2015 decision, there was ample evidence to support a conclusion by the jury

> that it was standard practice in the mortgage industry" to accelerate loans after 90 days of nonpayment on the loan from the borrower. [Defendants witness John] Dunnery also testified that the HomEq Defendants tended to accelerate loans " somewhere between day 55 to day 75 of the delinquency," although The Money Store" may have gone to day 95." Based on this testimony, the jury could reasonably infer that the defendants followed the mortgage industry standards and generally accelerated loans after 90 days without payment from the borrower. The experts' testimony about industry practices and the Dunnery's testimony about the HomEq Defendants' loan acceleration practices applied to the borrowers on a classwide basis such that the common question of the

1   defendants' liability still predominated at trial.

2   135.   In fact, as the Court noted: "the defendants pointed to no case out of the

3   thousands of loans included in the class where no payments were made on a loan for

4   more than 90 days, and where the loan was never accelerated. In the absence of any

5   contrary evidence, the jury could rely on the expert testimony of industry practice and

6   Dunnery's testimony as to the defendants' practice."

7   136.   Based on the evidence presented by the Late Fee Class, including the

8   testimony from Defendants' own witness John Dunnery, it would appear as if

9   Asberry's loan was accelerated – at the latest – by December 1, 2005.  There were

10  numerous late charges posted to his account after that date, at least one of which he

11  was assessed at the time of the June 2006 payoff.

12  137.   Though Asberry should have been identified as a member of the both the

13  Late Fee and Split Fee classes certified by the court in Mazzei, Asberry was never

14  advised of the existing class action due to, among other reasons, the shortcomings

15  with the Ocwen Database.

16  138.   Asberry had no basis to believe that he might have been charged for

17  improper fees and/or expenses by the Defendants until he was notified by counsel for

18  the respective Classes in 2017.  Defendants had concealed critical information from

19  Mr. Asberry starting from the time of payoff of his loan through the present including,

20  but not limited to:  (i) concealing the fact that the fees charged to him at the time of

21  the June 9, 2006 payoff were being illegally shared with non-attorneys; (ii) concealing

22  the fact that the fees charged to him on June 9, 2006 included an outsourcing or

23  referral fee which was in direct violation of Fannie Mae and Freddie Mac regulations;

24  (iii) concealing the fact that the fees charged to him on June 9, 2006 were in excess

25  of those which Defendants themselves were allowed to be charged pursuant to the

26  governing agreements with their Outsourcers, Trustees and/or Attorneys;

27  / / /

28  / / /

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

139.   As a result, Mr. Asberry's claims against Defendants either did not accrue until Mr. Asberry was contacted by counsel, or were subject to tolling under California and/or federal law.

## FIRST CAUSE OF ACTION

### Breach of Contract

### (Against All Defendants)

140.   Plaintiffs repeat and reallege each preceding Paragraph of the Complaint as if fully set forth herein.

141.   By reason of the foregoing acts, the HomEq Defendants have breached the terms of the Loan documents executed by the parties by charging plaintiffs and the prospective classes for late fees after acceleration which are not permitted by the parties' contract.

142.   Defendants are bound by the provisions of the Loan Documents of those loans which they originated or were assigned.

143.   Defendants are bound by the provisions of the Loan Documents with regard to late fees imposed on customers with property located in California under §3521 and §1589 of the California Civil Code because Defendants collected and retained late fees from plaintiffs and members of the proposed class as additional compensation under the guise of the late fee provision in the loan documents.

144.   Moreover, Defendants were specifically assigned the right to retain late fees collected pursuant to the terms of the Loan Documents in Pooling and Servicing Agreements, Servicing Agreements and/or other contracts entered into between Defendants and investors on loans which the Defendants did not themselves originate or which were not subsequently assigned to them.

145.   As a result, the HomEq Defendants are liable to each Plaintiff in the amount of his actual damages to be established at trial.

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

## SECOND CAUSE OF ACTION

### Breach of the Covenant of Good Faith and Fair Dealing

### (Against All Defendants)

146.   Plaintiffs repeat and reallege each preceding Paragraph of the Complaint as if fully set forth herein.

147.   As alleged above, and by reason of the foregoing acts, the HomEq Defendants have breached the terms of the Loan documents executed by the parties by charging plaintiffs and the prospective classes for late fees after acceleration which are not permitted by the parties' contract.

148.   Implied in the agreements executed by the parties is an implied covenant of good faith and fair dealing. However, Defendants' conduct as alleged in this Complaint was in derogation of that covenant of good faith and fair dealing.

149.   Plaintiffs and members of the prospective classes have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the agreements.

150.   However, Defendants breached the covenant of good faith and fair dealing by, among other things, collecting and retaining late fees from plaintiffs and members of the proposed class as additional compensation under the guise of the late fee provision in the loan documents.

151.   As a direct and proximate result of Defendants' breach of the covenant of good faith and fair dealing, Plaintiffs and members of prospective classes have suffered damages in an amount to be established at trial.

## THIRD CAUSE OF ACTION

### (Unfair Business Practices (Cal. Bus. & Prof. Code § 17200, et seq.))

### (Against All Defendants)

152.   Plaintiffs repeat and reallege each preceding Paragraph of the Complaint as if fully set forth herein.

153.   Defendants engaged in a pattern of unfair, unlawful, fraudulent and deceptive business practices under California Business & Professional Code § 17200, et seq. in attempting to collect or collecting: (i) late fees after acceleration from Plaintiffs and other members of the Class in violation of, *inter alia*, in Section 2924c, 2924d and 2954.4 of the California Civil Code and standard industry practice; (ii) legal fees split with non-attorneys in violation of Rule 1-320 and/or 2-200 of the California Rules of Professional Responsibility; (iii)  outsourcing fees in violation of the governing industry prohibitions imposed by Fannie Mae and Freddie Mac; and/or (iv) fees and expenses in excess of those it was permitted to be charged under the Master Service Agreements between Defendants, Fidelity and other outsourcers, and/or the Network Agreements between  Fidelity or other outsourcers and the law firms representing Defendants in foreclosure and bankruptcy.

154.   As the result of Defendants' violations of California Business & Professional Code § 17200, et seq., Plaintiff and every other member of the Class is entitled to full restitution and/or disgorgement by Defendants of all revenues, earnings, profits or other economic benefits that Defendants have derived from their unfair, unlawful, deceptive and fraudulent business acts or practices.

## FOURTH CAUSE OF ACTION

### (Restitution to Avoid Unjust Enrichment)

### (Against All Defendants)

155.   Plaintiffs repeat and reallege each Preceding paragraph of the Complaint as if fully set forth herein.

156.   In collecting and retaining post-acceleration late fees, Defendants received a benefit from Plaintiffs and other members of the late fee class.

157.   Permitting the Defendants to retain post-acceleration late fees collected from Plaintiffs and the class would be unjust and inequitable.

/ / /

/ / /

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

158. Accordingly, Plaintiffs are entitled to full restitution and/or disgorgement by Defendants of all post-acceleration late fees earned at Plaintiffs' detriment and expense.

### FIFTH CAUSE OF ACTION

### Fraud

### (Against All Defendants)

159. Plaintiffs repeat and reallege each preceding Paragraph of the Complaint as if fully set forth herein.

160. In charging Plaintiffs and the other members of the Fee Split class for purported "attorney's fees" or "trustee's fees" that were comprised in part of amounts secretly paid to Fidelity and/or other outsourcers, Defendants engaged in a false representation designed to induce plaintiffs and other prospective members of the fee-split class to pay the fees.

161. Defendants were aware that the representations that the amounts charged were "attorney's fees" or "trustee's fees" were in part false, as the Defendants were aware that they did not pay Fidelity or the other outsourcers, who received their compensation out of the legal fees charged to HomEq and passed on to plaintiffs and the class.

162. Plaintiffs and the class reasonably relied on the representations that these amounts consisted of Attorney's or Trustee's Fees that could legally be charged by paying these amounts, and were damaged as a result.

163. In addition, Defendants failure to disclose the fact that the fees charged to Plaintiffs and members of the Class consisted in part of outsourcing fees which were prohibited by prevailing industry guidelines from both Fannie Mae and Freddie Mac also constitutes concealment actionable as fraud under California law.

164. In addition, Defendants failure to disclose the fact that the fees charged to Plaintiffs and members of the Class were in excess of those Defendants were allowed to be charged under the governing Master Service and Network Agreements

1  constitutes concealment actionable as fraud under California law

2  165.   As a legal and proximate result of Defendants misrepresentations and
3  concealments of material facts, Plaintiffs have suffered significant damages, to be
4  proven at trial.

5  166.   In performing the acts alleged herein, Defendants acted fraudulently,
6  despicably, and in willful and conscious disregard of Plaintiffs' rights. Defendants
7  made the foregoing misrepresentations and concealments of material fact for the
8  purpose of depriving Plaintiffs of money. Therefore, an award of punitive damages
9  against Defendants is justified.

## PRAYER FOR RELIEF

11  WHEREFORE, Plaintiffs pray for relief and judgment against Defendants as
12  follows:

13  (i)   Determining that this action is a proper class action, certifying Plaintiff
14      as class representative under Rule 23 of the Federal Rules of Civil
15      Procedure, and appointing his counsel as class counsel;

16  (ii)   Awarding compensatory and statutory damages in favor of Plaintiff and
17      the other Class Members against the Defendants for all damages
18      sustained as a result of the Defendants' wrongdoing, in an amount to be
19      established at trial, including interest thereon;

20  (iii)   Awarding punitive and/or exemplary damages in favor of Plaintiff and
21      the other Class Members against the Defendants;

22  (iv)   Ordering the Defendants to disgorge, and to provide restitution to
23      Plaintiffs and other Class Members, for all moneys received from
24      borrowers as payment for alleged attorneys' fees, post-acceleration late
25      fees, and other fees and expenses which are found to be improperly
26      assessed;

27  (v)   Awarding Plaintiff and the Class their reasonable costs and expenses
28      incurred in this action, including counsel fees;

GIRARD BENGALI, APC
333 SOUTH GRAND AVE., SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300

(vi)   Awarding Plaintiff and other Class Members prejudgment and post-judgment interest as allowed by law; and

(vii)   Awarding such other and further relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs request a trial by jury of all issues and causes of action so triable.

DATED: February 16, 2018

*/s/ Omar H. Bengali*

OMAR H. BENGALI
obengali@girardbengali.com

GIRARD BENGALI, APC
ROBERT J. GIRARD II (SBN 216949)
rgirard@girardbengali.com
OMAR H. BENGALI (SBN 276055)
obengali@girardbengali.com
333 South Grand Ave., Suite 4040
Los Angeles, California 90071
Telephone: (323) 302-8300
Facsimile:  (323) 302-8310

THE LAW OFFICES OF PAUL
GROBMAN
PAUL GROBMAN (NY SBN 2192649)
*(pro hac vice forthcoming)*
grobtown@aol.com
555 5th Avenue Floor 17
New York, NY 10017

Attorneys for Plaintiffs SHIRLEY PIATT,
DARRELL ASBERRY, MICHAEL F.
CORDES, on behalf of themselves and all
others similarly situated

GIRARD BENGALI, APC
333 SOUTH GRAND AVE. , SUITE 4040
LOS ANGELES, CALIFORNIA 90071
(323) 302-8300